## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                  Criminal No. 06-CR-298
                                                           (PJS/SRN)

      Plaintiff,

      v.                                       <u>REPORT AND RECOMMENDATION</u>

Lyle Robert Paton,

      Defendant.

---

Tracy T. Braun, Esq., on behalf of Plaintiff

Seamus R. Mahoney, Esq. and Jennifer M. Macaulay, Esq., on behalf of Defendants

---

SUSAN RICHARD NELSON, United States Magistrate Judge

      The above-captioned matter comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Stops, Arrests, and Searches (Doc. No. 18.)  This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.     BACKGROUND

      An Indictment was filed on September 12, 2006, charging Defendant with five counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e), and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2).

      Colleen Lesedi, an officer with the St. Paul Police Department testified at the criminal motions

1

hearing.  The following exhibits were received in evidence:

> Govt. Ex. 1: The application, affidavit, search warrant, and receipt and inventory return for a
>
> residence in Minneapolis, Minnesota, an automobile, and Defendant's person;
>
> Govt. Ex. 2: The application, affidavit, search warrant, and receipt and inventory return for a
>
> residence in Minneapolis, Minnesota.

This matter is set for trial before United States District Judge Patrick J. Schiltz on February 9, 2007.

## II.    FACTS

On July 7, 2006, Officer Colleen Lesedi of the St. Paul Police Department (the "SPPD") was on duty as a patrol officer, patrolling alone in her squad car.  Officer Lesedi is a four-year member of the SPPD and she is both a patrol officer and an "Officer Friendly," a role in which she educates young children about safety.  As a patrol officer, Officer Lesedi's duties include operating a squad car, responding to calls, making traffic stops and conducting patrols.

At 12:58 p.m. on July 7, 2006, Officer Lesedi responded to a call from a concerned citizen regarding a suspicious person at 350 Water St. West, in St. Paul, Minnesota, the location of Lilydale Park.  (See Application, Receipt, Inventory and Return, Govt. Ex. 1.)  The call reported a suspicious white male in possession of a digital camera heading into the woods, accompanied by what was reported to be five black male children[1].  When Officer Lesedi arrived, she spoke directly with the concerned caller, who repeated her concerns about a white male and five male children heading into the

---

[1]The children were later determined to be of Asian descent.

woods.  The concerned citizen explained that she was anxious about the group heading into the woods because the white male was shabbily dressed, one juvenile was smoking, the juveniles appeared sober and the juveniles' body language was "off" and did not suggest that they were having a good time. Officer Lesedi could not see the group while speaking with the concerned citizen.  She then parked her squad car in such a way as to prevent the car that the group had arrived in from leaving the parking lot and informed the concerned citizen that she would head into the woods to look for the group.  The concerned citizen volunteered to stay behind.

Officer Lesedi did not locate the group as she went into the woods, but instead found them as she was returning to the woods' entrance.  She approached them from behind and tried to radio dispatch, however, dispatch could not copy her signal.  After noticing her presence, one of the young juveniles tapped the white male on the shoulder.  After reaching the group, Officer Lesedi inquired about what they were doing in the woods.  She testified that her tone was non-confrontational and cheerful, the same tone that she would use to ask a question of anyone.  One juvenile responded that they were looking for fossils.  Officer Lesedi asked if they had found any, to which he replied that they had not.  She then asked if they were a summer class.  She testified that the juveniles appeared "on edge" and evasive in their responses, and that one juvenile explained that the white male was a friend of the family.  While she questioned the juveniles, the white male would not respond to her questions, except to occasionally shake his head.  He was wearing a buttoned up short sleeve shirt, tan pants and beat up dress shoes.  Officer Lesedi found these clothes ill-suited for a walk in Lilydale Park because the park lacked paved trails.  Moreover, it was hot on the day in question.  She asked the white male for his ID and noted that he was the Defendant, Lyle Robert Paton.  At some point during this

3

encounter, she noticed that Defendant was carrying a digital camera.  She then told Defendant and the

juveniles to "have a good day" and walked out of the woods.  Defendant and the juveniles followed

slowly.

When Officer Lesedi returned to the parking lot, she used her cell phone to call "Channel 5"

and learned that Defendant was a registered sexual predator.  She next called the Minnesota Bureau of

Criminal Apprehension ("BCA") where she learned that the Defendant had two prior offenses: one

involving child pornography and one for criminal sexual conduct in the third degree involving a black

juvenile male.  The BCA advised Officer Lesedi to do everything in her power to protect the children.

While Officer Lesedi was speaking on the telephone, she observed Defendant emerge from the

woods alone and walk to his car.  Defendant did not approach Officer Lesedi nor did he attempt to

contact her.  While Defendant waited for the juveniles to emerge from the woods, Officer Lesedi called

out to Defendant and asked for him to "wait."  The juveniles eventually emerged from the woods,

walking slowly.  They observed her squad car and waited by Defendant's car, without asking either her

or Defendant any questions.

At some point, Officer Lesedi called for backup from the SPPD.  When the second squad car

arrived, Officer Lesedi observed Defendant bowing and shaking his head, as if saying "no."  Officer

Schuck, who arrived in the second squad car, conferred with Office Lesedi and thereafter approached

Defendant.  Officer Schuck explained to Defendant that he needed to search his person for officer

safety.  Defendant consented to the search, which yielded no weapons.  Officer Schuck then explained

to Defendant that he was not under arrest, but nonetheless requested that he sit in the back of Officer

Lesedi's squad car.  Defendant again complied with this request and the officers closed the doors of the

4

squad car and turned on the air conditioning.  Officer Lesedi testified that the police decided on this course of action because it was a very hot day and Defendant indicated he was not feeling well. Throughout this interaction, Defendant was not handcuffed.

Officer Schuck eventually approached Officer Lesedi and asked if she knew the location of Defendant's digital camera.  Officer Lesedi did not know how Officer Schuck had become aware that Defendant no longer possessed the digital camera and she testified that she had not realized that the camera was missing until that time.  She did not see the camera in the parking lot and, as the doors of Defendant's car had remained closed throughout the encounter, she knew that he had not placed it in his vehicle.  She spoke with the juveniles, and they told her that they had seen the Defendant with the camera as he started to walk out of the woods toward the parking lot.  However, they were unaware of the camera's location at that time.

Eventually, other officers arrived at Lilydale Park, including Officer O'Brien, Officer Lesedi's supervisor, Officer Clarkin and a canine unit officer with his canine.  Officer Schuck reported that Defendant told him that the camera was in the weeds close to the entrance to the woods.  Defendant offered to lead the officers to the camera, but Officer Schuck said that the canine would search for it. The canine eventually located the camera approximately fifty yards from the path's entrance to the woods and roughly ten feet from the path itself.  The camera's memory card door was open, and the digital memory card was missing.  Officer Schuck inquired of Defendant about the digital memory card and Defendant stated that it was in his wallet.  Officer Schuck subsequently recovered the digital memory card with Defendant's permission.  Officer Lesedi described the digital memory card as appearing "ripped up or chewed up."  Officer Schuck later described the card as appearing "as if

someone had been picking it apart with their fingernail."  (See Application, Receipt, Inventory and

Return, Govt. Ex. 1.)

When interviewed, the juveniles told the police officers that Defendant had taken three photos

of each boy while he was holding a fossil.  None of the juveniles stated that pornographic photos had

been taken, and none of the juveniles told Officer Lesedi that something amiss had occurred.  Officer

Lesedi eventually called the father of one of the juveniles, and he informed her that he had given

permission for the juveniles to be with Defendant.  Defendant denied taking any pictures of the

juveniles.  (See Application, Receipt, Inventory and Return, Govt. Ex. 1.)

Defendant's wife, Helen Brown Bruce, was the registered owner of the vehicle that Defendant

drove to Lilydale Park with the juveniles.  (Id.)  Officer Clarkin went to her place of employment and

obtained her signed, written consent to search the vehicle.  (Id.)  At that time, Ms. Bruce expressed

concerns to Officer Clarkin regarding Defendant's association with juvenile males.  (Id.)  Officers

transported Ms. Bruce to Lilydale Park.  (Id.)  When she arrived, she stated that she did not recognize

the juveniles who had accompanied Defendant to the park.  (Id.)  When the police searched the

automobile in question, they uncovered a second digital memory card.  (Id.)

On July 14, 2006, two of the juveniles whom Defendant had brought to Lilydale Park on July

7, 2006, identified only as "R.T." and "S.C.," went to the Midwest Children's Resource Center in St.

Paul for appointments with Maggie Carney, R.N.  (Id.)  Nurse Carney specializes in medical

interviewing and the examination of sexually and/or physically abused children.  (Id.)  R.T. and S.C. did

not have an opportunity to consult with each other between interviews.  (Id.)

During the course of his interview, R.T. revealed that Defendant had taken nude photographs of

him, as well as of other children.  (Id.)  He described multiple occasions, over a two-year period, on

which Defendant would take the children to the woods, railroad tracks, or a location off Highway 13 to

take nude photographs, or film nude movies, of them.  (Id.)  He also stated that Defendant had tried

touching and rubbing his penis.  (Id.)  In exchange, R.T. told Nurse Carney, Defendant would buy

clothing, shoes, toys, and video games for the children, and, in addition, pay for movie tickets and food.

(See Application, Receipt, Inventory and Return, Govt. Ex. 1.)  Finally, R.T. disclosed that he felt

forced to allow Defendant to take the nude photographs of him because he feared that Defendant

would rape him if he refused.  (Id.)

      In his interview, S.C. stated that Defendant would determine the number of items, or dollar

value of merchandise, that he would purchase for the juvenile(s) on the basis of the number of nude

photographs that the juvenile(s) would permit him to take.  He revealed that Defendant had initially

given him "gifts" without expecting nude photographs in return, and that Defendant had been taking

nude photographs of him for approximately two years.  (Id.)

      On July 17, 2006, Sergeant Julie Harris of the SPPD, applied for, and obtained, a search

warrant for Defendant's home and person, and the automobile in question.  On July 19, 2006, the

SPPD, along with the Minneapolis Police Department, executed a search warrant at Defendant's

residence.  (See Application, Receipt, Inventory and Return, Govt. Ex. 2.)  When the police officers

arrived at Defendant's home, they found an envelope containing a house key marked "For police use

only."  (Id.)  Defendant later explained to an Officer Halverson that he left this envelope because he

was expecting the police to search his home and did not want the police to break down his front door,

as they had in 1995.  (Id.)  Child pornography was recovered.  (Id.)

### III.    MOTION TO SUPPRESS

#### A.    The Investigative Stop and Seizure of the Camera and Digital Memory Cards

##### 1.    The Investigative Stop

Defendant contends that the Court should suppress the camera and digital memory cards seized by the St. Paul Police Department on July 7, 2006 because they were obtained pursuant to a series of illegal seizures of his person.  (Def.'s Mem. Supp. Mot. Supp. at 1.)  According to Defendant, the SPPD lacked a reasonable suspicion to conduct an investigative stop of Defendant in Lilydale Park on July 7, 2006.  (Id. at 8.)  He argues that, at the time Officer Lesedi subjected him to an investigative stop, his criminal history constituted the only possible basis for reasonable suspicion and that "[c]riminal history is no reasonable articulable suspicion."  (Id.)  He further asserts that his lengthy stay in the back of Officer Lesedi's squad car constituted a warrantless full-scale arrest and that the SPPD wrongfully conducted this arrest without probable cause.  (Id. at 9.)  Therefore, he maintains that the fruits of these illegal searches and seizures, namely his digital camera and the two digital memory cards, should be suppressed under the fruit of the poisonous tree doctrine.  (Id. at 10.)

The Government responds that the Court should deny Defendant's motion to suppress the camera and digital memory cards at issue because the SPPD committed no violation of Defendant's Fourth Amendment rights during the course of their various interactions with Defendant in Lilydale Park on July 7, 2006. (Gov. Mem. Opp. Mot. Supp. at 3, 5, 7-8.)  The Government first argues that the initial meeting in the woods between Officer Lesedi and Defendant was a lawful consensual encounter. (Id. at 3.)  After Defendant emerged from the woods, the Government contends that the SPPD then

8

subjected him to an investigatory stop when the investigating officers subjected him to a patdown search and asked him to sit in the squad car, and the Government maintains that the stop was lawful because it was supported by reasonable suspicion.  (Id. at 5.)

"'Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.'"  United States v. Vera, 457 F.3d 831, 834 (8th Cir. 2006) (quoting United States v. Drayton, 536 U.S. 194, 200 (2002)).  If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required.  United States v. Ward, 23 F.3d 1303, (8th Cir. 1994) (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991) (internal citation omitted)).

"'Seizures fall into two categories: investigative stops and arrests. There is no bright line of demarcation between the two.'"  United States v. Dixon, 51 F.3d 1376, 1380 (8th Cir. 1995) (quoting United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)).  Officers may briefly stop and detain a person for investigative purposes if they have reasonable suspicion supported by articulable facts that criminal activity may be afoot.  United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995) (citations omitted), cert. denied, 516 U.S. 1139 (1996).  A finding of reasonable suspicion is based on the "totality of the circumstances" viewed in light of the experience of trained law enforcement officers.  Id. (citations omitted).  "Although each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'"  United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004) (internal citations omitted).

A warrantless full-scale arrest for a felony offense, in contrast, requires probable cause.  The

Eighth Circuit has stated:

> An investigative detention may turn into an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." During an investigative stop, officers should "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose" of the temporary seizure. The means used to effect the seizure must be objectively reasonable in light of the facts and circumstances confronting the officers.

United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (internal citations omitted). Moreover, investigating officers may conduct an investigative detention as long as is reasonably necessary to dispel their suspicion. United States v. Dixon, 51 F.3d 1376, 1381 (8th Cir. 1994).

The Court finds that Officer Lesedi's initial conversation with Defendant in the woods was a consensual encounter. Officer Lesedi approached Defendant from behind, asked questions in a friendly, conversational tone and did not take any action which would signal to Defendant that he was not free to continue on his way. Defendant freely interacted with Officer Lesedi.

The parties do not contest that the SPPD subjected Defendant to an investigative stop after he emerged from the woods and the only issue facing the court is whether the investigative stop was supported by reasonable suspicion that criminal activity may have been afoot. The Court finds that the totality of the circumstances supported the formation of a reasonable suspicion that a crime, namely the production of child pornography or another crime involving the sexual exploitation of children, may have been afoot. As Defendant recognizes, by the time he emerged from the woods, Officer Lesedi had already identified him as a registered sex offender who had prior convictions involving child pornography and criminal sexual conduct in the third degree with a non-familial black juvenile. He was in a secluded park with a camera and therefore had the opportunity and means to create child

pornography.  Moreover, he was in the company of juveniles who shared similar characteristics with the juvenile whom he had previously molested.

In addition, Officer Lesedi could point to several facts gleaned that day that would support the conclusion that the reasons stated by the juveniles for being in the park, namely the collection of fossils, was pretextual.  Officer Lesedi noticed that Defendant was not dressed appropriately to walk along the unpaved paths in Lilydale Park, as he was wearing clothes that were ill suited for the hot weather and old dress shoes, rather than tennis shoes or hiking boots.  The concerned citizen who had initially called the SPPD described the children's body language as sober, and Officer Lesedi characterized the juveniles as evasive when questioned.  Defendant himself did not provide verbal answers to Defendant's questions, but merely moved his head in response to a few questions.

The Court next turns its attention to Defendant's argument that the SPPD subjected him to a de facto arrest without probable cause and that this illegal seizure constitutes grounds to suppress the digital camera and digital memory cards.  After conducting a patdown search of Defendant for officer safety, Officer Schuck informed Defendant that he was not under arrest.  He then asked Defendant to voluntarily remain in the back seat of Officer Lesedi's squad car and Defendant apparently complied with this request until the Officers completed their investigation.  (Search Warrant App. and Aff., Govt. Ex. 1.)  Officer Lesedi testified that the SPPD engaged in this course of action in part because of concerns regarding officer safety and in part because the weather was hot, and Defendant had indicated that he did not feel well.  The officers turned on the air conditioner and rolled up the squad car's windows.  Defendant was not handcuffed.  The Court finds that under the totality of these circumstances, the investigating officers used an objectively reasonable means to detain Defendant for

further investigation.

Defendant contends that the officers seated him in the back of the squad car for one hour. Even assuming that this is true, it will not transform the officers' investigatory stop into a full scale arrest. The officers used that time to bring Defendant's wife to the scene to authorize a search of his car, to call the juveniles' parents and to locate Defendant's camera and digital memory card. All of these actions furthered their investigation into whether Defendant had produced child pornography at Lilydale Park. There is no indication in the record that the investigating officers delayed, or that they could have completed these tasks in a shorter time. See e.g., United States v. Maltais, 403 F.3d 550, 556-557 (8th Cir. 2005) (the totality of the circumstances justified holding the defendant for three hours, including ninety minutes in the investigating officers' squad car). The circumstances here do not rise to the level of a full scale arrest and therefore the Court need not inquire into whether the investigating officers had probable cause to conduct such an arrest.

### 2.    Seizure of the Digital Camera and Digital Memory Card

The Government argues that its seizure of Defendant's camera did not violate the Fourth Amendment and therefore does not provide a basis for suppression of the camera and digital memory card because the Defendant abandoned the camera as he began to exit the woods. In addition, the Government argues that Defendant consented to Officer Schuck's search of his wallet for the digital memory card, and therefore the Government's seizure of the memory card was consensual.

Defense counsel argues that "it is a dubious proposition that Mr. Paton, who had been sitting in the back of an air-conditioned squad car positioned behind his vehicle for almost an hour, really felt he could say no to any of the police officer's requests." (Def.'s Mem. Supp. Mot. Supp. at 8.)

When questioned by Officer Schuck, Defendant admitted that he 'got scared' and threw the camera into the woods.  (Search Warrant App. and Aff., Govt. Ex. 1.)  By voluntarily abandoning property in order to prevent its detection, a defendant forfeits any reasonable expectation of privacy therein.  United States v. Kelly, 329 F.3d 624, 629 (8th Cir. 2003); see also Abel v. United States, 362 U.S. 217, 241 (1960).

A consensual search is an exception to the Fourth Amendment's requirement that government searches require a warrant issued upon probable cause.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  The consent must be given voluntarily and qualifies as such "if it results from an essentially free and unconstrained choice rather than duress and coercion."  United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998).  "Whether consent is voluntary depends upon the "totality of the circumstances."  Id. (internal citations omitted).  When examining whether the consent was voluntary, courts consider:

> relevant characteristics of the consenting party [which] include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation. To assess the environment surrounding the consent, [courts] consider the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

Id.

At the time of his questioning by Officer Schuck, Defendant was fifty-eight years old.  He had two prior convictions and was therefore familiar with the police.  He was directly informed that he was not under arrest and never handcuffed.  The investigating officers even activated the air conditioning in

the squad car for Defendant's comfort.  The Court finds Defendant's arguments unpersuasive and that, under the totality of the above circumstances, Defendant voluntarily consented to the search of his wallet for the digital memory card.

**B.      The July 17, 2006 Search Warrant**

Defendant contends that the affidavit supporting the search warrant issued on July 17, 2006 failed to set forth sufficient probable cause because it lacked evidence of a nexus between the items to be searched for and Defendant's home and Ms. Bruce's vehicle.  (Id.)  Specifically, Defendant argues that the affidavit does not set forth any evidence that Defendant owned a computer.  (Id. at 11.)  Moreover, he maintains that the Government had already confiscated his digital camera and digital memory cards and there were no grounds to believe that he owned another camera.  (Id.)  In addition, he argues that the warrant failed to describe the incredulity that Ms. Bruce expressed when the SPPD contacted her regarding her husband.  (Id. at 11-12.)

The Government argues that the affidavit supporting the search warrant at issue sets forth sufficient probable cause.  (Id. at 10-11.)  In the alternative, the Government contends that the SPPD executed the warrant pursuant to the requirements of the good faith exception to the warrant requirement. (Id. at 13.)

To evaluate Defendant's contention, the Court turns to the inquiry of whether the "four corners" of the warrant affidavit supplied a substantial basis for concluding evidence of wrongdoing would be found in the place to be searched.  Specifically, the search warrant application sought authority to seize from Defendant's home and Ms. Bruce's automobile evidence related to the production and trafficking of child pornography, including digital cameras, computer systems, photographic images, and papers

14

and effects that tend to show the enticement of children on the Internet.  (Search Warrant App. and Aff., Govt. Ex. 1.)

"It is well-established that courts may *not* look to facts outside the affidavit in determining the existence of probable cause," United States v. Martin, 833 F.2d 752, 757 (8th Cir. 1987) (Lay, C.J., concurring), cert. denied, 494 U.S. 1070 (1990); rather, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999) (internal citations omitted).

"Probable cause exists if, based upon a common-sense consideration of all the circumstances set forth in the supporting affidavit, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).

Importantly, "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" as to whether a showing of probable cause has been met.  Illinois v. Gates, 462 U.S. 213, 235 (1983). Rather, "'in dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Id. at 231 (citations omitted).

"[T]he preference for warrants is most appropriately effectuated by according 'great deference'

to a magistrate's determination" as to the existence of probable cause.  United States v. Leon, 468 U.S. 897, 914 (1984); accord Gates, 462 U.S. at 236-37.  In this regard, this Court does not make a de novo review of the sufficiency of the affidavit.  Gates, 462 U.S. at 236; accord United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986) ("[A] district court should not make a de novo determination of probable cause . . . .").  Rather, "the decision to issue the warrant is to be upheld if supported by substantial evidence in the record," Reivich, 793 F.2d at 959, or, in other words, "so long as the [issuing Judge] had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." Gates, 462 U.S. at 236.  Moreover, a court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." United States v. Carlson, 697 F.2d 231, 238 (8th Cir. 1983).  Moreover, "there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000).

As a preliminary matter, the Court addresses Defendant's argument that the affidavit in support of the search warrant fails to establish a nexus between the items to be searched for and Ms. Bruce's automobile.  The affidavit set forth how Defendant, a convicted sexual predator, used the car to transport the juveniles whom he allegedly abused and exploited to the park on July 7, 2006, and how the SPPD uncovered a second digital memory card in the car during their search of the vehicle.  In light of the juveniles' accounts that Defendant transported them places to the woods and other locations to take nude photos of them, it is reasonable to infer that Defendant transported them to these locations in this vehicle, and that, therefore, the vehicle might contain more evidence of Defendant's illegal activities.

The Court next turns its attention to the nexus between the items identified in the warrant and

Defendant's home.  Sergeant Harris's affidavit stated that Defendant engaged in the production of child pornography with a digital camera and digital memory cards.  The affidavit noted that Officer Lesedi learned, in her initial conversation with the concerned citizen, that Defendant was heading into the woods, carrying a digital camera and accompanied by a group of male juveniles whose body language was "sober".  (See Application, Receipt, Inventory and Return, Govt. Ex. 1.)  It described how Officer Lesedi confirmed the presence of the digital camera when she encountered Defendant in the woods.

Moreover, the affidavit contained the juveniles' possibly conflicting stories regarding Defendant's use of the digital camera on July 7, 2006.  When Officer Lesedi encountered Defendant and the juveniles in the woods, one juvenile told Officer Lesedi that the group had not discovered any fossils.  (Id.)  However, the affidavit also noted that a juvenile later stated that Defendant had photographed the juveniles while they were holding fossils.  (Id.)  Moreover, the affidavit later stated that Defendant denied taking any photographs that day.  (Id.)  The affidavit also contained Defendant's admission to Officer Schuck that he "got scared" and threw the camera into the woods after encountering Officer Lesedi.  (Id.)

The affidavit described how, when the SPPD canine recovered the camera, its digital memory card door was open and the digital memory card itself was missing.  (Id.)  In addition, according to the affidavit, after recovering the digital memory card,  Officer Schuck described it as appearing "as if someone had been picking it apart with their fingernail."  (Id.)  Moreover, the SPPD also recovered a second digital memory card from the car which Defendant drove to Lilydale Park.  (Id.)

The affidavit also set forth the accounts of two of the juveniles who accompanied Defendant to Lilydale Park on July 7, 2006.  (Id.)  These juveniles described how, over a two-year period,

Defendant took them to the woods, railroad tracks and to a location near Highway 13 to take nude

photographs, and make nude movies of them and other juvenile males.  (Id.)  One juvenile male also

claimed that Defendant attempted to molest him by touching and rubbing his penis.  (Id.)  The affidavit

noted that the reporting juveniles lacked the opportunity to consult with each other between interviews.

(Id.)

      The affidavit revealed Defendant's prior convictions for child pornography and for criminal

sexual conduct with a child in the third degree against a non-familial black juvenile.  (Id.)  According to

the affidavit, Ms. Bruce expressed concern regarding Defendant's association with the Asian male

juveniles because Defendant had "tried treatment and counseling."  (Id.)

      At the time she applied for the warrant, Sergeant Julie Harris of the SPPD was a ten year

veteran of the force and was an investigator in the SPPD's Sex Crimes Unit.  (Id.)  She averred that, in

that capacity, she had experience investigating, and had received training regarding, child molestation,

child pornography, and "the exploitation of children for sexual purposes."  (Id.)  She noted in the

affidavit that,

> Just as a law enforcement officer would expect to find certain collateral items on a
> narcotics search, such as drug paraphrenalia, scales, notes related to the sale of drugs,
> etc., the search of the computer of a suspect who gets their sexual gratification from
> children, can expect to find images of minors (clothed and unclothed), child
> pornography...
>                  * * *
> Computer systems and the internet have replaced the file cabinet for the repository of
> evidence. ...

(Id.)  According to Sergeant Harris, child pornographers and pedophiles likely store child pornography

on their personal computer systems, and the Court finds that a reasonable inference is that these

computer systems are likely stored in their homes.  (Id.)

The Court notes that, in the child pornography context, the averment of an agent, trained and experienced in investigating child pornography and the sexual exploitation of children, that child pornographers tend to store their collections of child pornography in "a secure place" will satisfy the nexus requirement for a warrant to search a suspected child pornographer's home.  United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002).  In Chrobak, the government was investigating the transmission of child pornography via an Internet news group web site.  Id. at 1044.  The government determined that the sender of the images identified himself as "Post@ them. now" and discovered that the records of Post@them. now's Internet service provider identified Daniel Chrobak of North Little Rock, Arkansas, as the person to whom the moniker was registered.  Id.  When Special Agent Jill Hill, the coordinator of the FBI's Crimes Against Children office in Little Rock, Arkansas, received information regarding Mr. Chrobak's possible involvement in the child pornography ring, she determined Mr. Chrobak's residence by surveilling the address at which he supposedly resided and confirming the presence of an automobile registered to Mr. Chrobak.  (Id.)  Agent Hill then applied for a search warrant for Mr. Chrobak's residence.  Included in the supporting affidavit were the government's observations regarding the activities of Post@them. now, Mr. Chrobak's connection to the Post@them. now moniker, as well as averments regarding her training and experience investigating child pornography and the sexual exploitation of children and her opinion that "child pornographers 'almost always maintain and possess their materials in a place considered secure due to its inherent illegality.'" Id.  at 1044-1045.  Mr. Chrobak argued that that affidavit did not set forth probable cause to search his home because "someone else might have used his email address and Agent Hill performed

an insufficient investigation to prove otherwise." <u>Id.</u> at 1046.  The Eighth Circuit rejected Mr. Chrobak's argument and upheld the validity of the search warrant.

The Court finds that the facts and averments in Sergeant Harris's affidavit pass muster under the Fourth Amendment and create an adequate nexus between the items to be searched for and Defendant's home.

"And, even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed." <u>United States v. Johnson</u>, 219 F3d 790, 791 (8th Cir. 2000) (<u>citing</u> <u>United States v. Leon</u>, 468 U.S. 897, 923 (1984)).  There is absolutely no indication that the issuing judge abandoned her judicial role, that Sergeant Harris knew of the falsity or was reckless with regard to the truth of anything in her affidavit, that the warrant was facially deficient, or that the warrant was so lacking in probable cause as to render official belief in it unreasonable.  <u>See generally</u> <u>United States v. Leon</u>, 468 U.S. 897, 923 (1984).

## C.      Conclusion

The Court finds that none of the Government's actions in conducting an investigative stop of Defendant and in searching for and seizing Defendant's digital camera and memory cards were prohibited by the Fourth Amendment.  In addition, the Court finds that the challenged search warrant was issued upon probable cause.  Accordingly, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Stops, Arrests and Searches be denied.  (Doc. No. 18.)

THEREFORE, IT IS HEREBY RECOMMENDED that:

1.      Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Stops,

Arrests, and Searches (Doc. No. 18) be **DENIED**;

Dated: January 4, 2007

                   s/ Susan Richard Nelson
                SUSAN RICHARD NELSON
                United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by **January 19, 2007,** after being served with a copy thereof.  The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.